Good morning, my name is Ashley Conlogue, I represent Plaintiff and Appellant Sandra Shah. I'd like to reserve about five minutes for my rebuttal, if it pleases the court. This is a case that comes on a motion to dismiss, as the court is aware. There's a DeNovo Seat Gup Council, sorry, I apologize, let me see if I can adjust this. This case comes on a strange procedural posture, because this is a motion to dismiss that was decided well after the discovery had virtually completed in the underlying court. We have a very robust discovery and record of what actually happened in this case with this very tragic death of this young gentleman. The facts are clear that within one minute of being transferred to Parkview Community Hospital, he was instructed to be taken off the premises. And one minute after that instruction was given, he was in fact removed. Within several minutes, about an hour of being removed, he died on the street, outside of the hospital. This is a very tragic case, and I think a very clear cut in EMTALA violation here. All of these facts were- For purposes of EMTALA, can the screening be done by EMT personnel? No, under EMTALA, the screening must be done by the hospital personnel. That is the only person that is covered by the EMTALA law. The EMTALA law is very clear that it has to be a Medicaid-receiving emergency room that is covered. So under EMTALA law, if EMT took the vitals immediately, I'm giving you a hypothetical, I'm not going to the facts of this particular case. So if somebody's rushed to the hospital, EMT takes their vitals and do the screening that you're asking for on the premises, and then tells the hospital, that still is a violation of EMTALA. So hospital personnel need to go through the same process over again, and in no way can rely on what EMT does? Yes, under that hypothetical. And the reason for that is because the EMTALA law requires a hospital to do a screening that is within the capabilities of that hospital parameters. So that would be a higher threshold, hypothetically, in this situation than an EMT would be able to do, because an EMT has very few resources available to them. They're working in the field. The resources and materials that are available in a hospital setting would, hypothetically, be much more extensive. They would have much more ability to do testing, things like that. Right. I thought in this particular case that the screening test that you alleged the hospital needed to do was actually done by EMT personnel and communicated to the hospital. Is that not correct? No. In the complaint, we've alleged that the hospital should have done a whole panoply of tests, including an EKG, long-term monitoring of breathing rate, heart rate, all of those types of things. Other testing that is specified in the hospital's policies and procedures. That would have gone far beyond what an EMT would have been capable of doing in the field. In this case, the EMTs weren't even able to do the full testing that they even had in their ambulance, because the defendant was in so much distress that he wasn't even able to be, they weren't able to put the heart rate monitors on him that would have continuously monitors heart rate, which is what the standard would have been for even an ambulance situation. So he required, in order to meet the screening requirements under EMTALA, the hospital should have done at least what the EMTs could do and more. And they did not do, the record is very clear that the hospital did absolutely nothing, not even listen to his heart. Well, that's why I wanted to clarify, because it's kind of, as you said, an odd procedural posture. There are the allegations in the complaint, which suggests to me that the vitals were done and communicated to hospital personnel, but then I know you have the benefit of additional discovery as well. Yes, so the facts and what I've attempted to allege, I hope it is clear in the complaint, but the facts are that the EMTs took his heart rate as they were able to in the ambulance and communicated that information to the hospital. That information is helpful to the hospital to understand what type of patient they're receiving, but the hospital under EMTALA is not allowed to just utilize that information and then skip that test on their own. They need to do a screening pursuant to EMTALA when that patient comes in, even if it means duplicating things like heart rate, breathing rate. And of course, those things change rapidly over time with a patient that is suffering a real, true medical emergency. So the fact that his heart rate was taken in the ambulance maybe some minutes before arrival doesn't mean that that's what his heart rate is when he comes into the hospital. So the hospital needs to repeat that test so that they can see whether his vitals are stable, whether they're changing dramatically. That's another reason why that test is important. So in terms of what's happening below, what you're asking for is for this case to be sent back and the parties are ready to proceed to summary judgment? Yes, the summary judgment was fully briefed at the time that this ruling came down. So what we're asking for is the case to be remanded and proceed forward with a district court. Well, remanded and obviously the motion to dismiss would have to be heard again based on this court's instruction, but then presumably we would proceed forward. But it's fully briefed and the other motion's ready to go? It is fully briefed. It was sitting with the court pending when this ruling came down essentially in its stead. Unless the court has any further questions, I will reserve my time for rebuttal. All right. Thank you. Good morning. Judge Nguyen, Judge Ikuda, Judge Anello. Marshall Shepardson for Parkview Community Medical Center. And I would like to address my colleague Ms. Ponla's statement that EMTALA required the hospital to provide a whole panoply of tests. I think this goes to the problem with plaintiff's position that collapses EMTALA's requirement of a screening with a general negligence standard of treatment, which is the province of state court negligence and other law. What they've done is attempted to expand the analysis of screening into a full course of admission, in fact. So, as I understand it, the argument is that Parkview did nothing, no screening at all. And they cite cases that say under EMTALA, no screening at all is an EMTALA violation. So, can you address that? We believe it's a quite glaring mistaken statement to say that no screening was done at all. In fact, in the Fourth Amendment complaint, which is at issue in paragraph 50, it's judicially admitted that this patient was assigned an acuity rating of 3. Now, they take issue with whether that was the correct acuity rating for a patient with these signs and symptoms. Was that based on the information conveyed by emergency personnel? In part. And I'm glad Your Honor brought that up because Ms. Ponla argues that under EMTALA, a hospital cannot rely on EMT findings in order to satisfy the screening requirement. There's no precedent for such a rule. That is not a rule. And the rule for screening under the text of the code section is quite simple, quite straightforward, and quite clear. It's that they simply need to determine whether or not an emergency medical exists or medical condition exists as defined below, which is a medical condition manifesting itself by acute symptoms of such severity that it appears that life and organ integrity is in jeopardy. So, I'm looking at 1395 DD, which says that the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, which I assume that's what opposing counsel is relying on. Correct. But a screening examination only needs to go so far as necessary to determine whether an emergency medical condition exists under the circumstances. So, the opposing counsel also relies on our decision baker, which talks about desperate screening and then makes allegations that other patients that were similarly situated had more screening than Mr. Shiloh did. So, what's your response to that? Thank you for bringing that up, Judge Ikuda. When you read the vignettes as alleged in the Fourth Amendment complaint of the three other patients who were allegedly screened differently, the plaintiff has simply expanded the definition of screening to such a gaping degree that it encompasses the entire treatment. And they say that they were monitored for so many number of hours, and they were all admitted. And this is an important point. Admission necessarily takes place after screening. We don't know what any of those patients underwent as far as a triage, because that's not even part of the allegations. At this point, we're just relying on the allegations of the complaint. And the complaint alleges that Parkview did no examination or screening of Shiloh. So, looking just at the allegations of the complaint, what screening did Parkview provide? And just point me to that section of the complaint. The complaint, as I said before, Paragraph 50 alleges that a – Paragraph, which paragraph? Paragraph 50, Your Honor. Your Honor. Okay. Pursuant to Parkview policy – oh, decedent was assigned an acuity rating of three. So this was based on a visual and information-taking exam, which the information-taking being from the EMT. So you're inferring that from – because this is in the passive voice. Decedent was assigned an acuity rating of three. Correct. Correct. So you're inferring that the hospital did something in screening decedent, Mr. Shiloh. There are additional allegations regarding further encounters that the decedent had with the staff. Give me a moment. There are allegations that – I believe it's in the 30s. Oh, here, in number 40. At approximately 7.32 p.m., an admitting clerk was seen talking to the decedent. She, the admitting clerk, later stated that the decedent was altered, mentally out of it, had difficulty time-standing, was unbalanced, and was leaning against the counter for balance, falling down. This all amounts to a visual screening process and a screening examination of the plaintiff. Now, did it discover the overdose or septic condition that ultimately killed the patient? Apparently not. But that's all the province of state court negligence law, not MDOT. Did you raise this argument in your briefing? I'm just trying to – I don't remember this. Oh, I'm sorry. Can you say that again? Did you raise this argument in your briefing? I just don't remember it. I am trying to address Your Honor's question as best I can, whether it was raised in the briefing. I think the briefing merely tried to get across that the screening was long finished by the time the encounter with security occurred. That is really the crux of the plaintiff's complaint. The screening and the subsequent events are two different events that need to be analyzed separately. The screening is analyzed under EMTALA. The encounter with security and so forth is all going to be analyzed under state court law, state law. What's odd about this case, as I discussed with your opposing counsel, is that, you know, we're here on appeal of a motion dismissed, so we're limited to the allegations of the complaint, and the complaint wasn't clear, at least to me, what the overlap is between the screening, because the complaint does lay out the fact that within four minutes or so of encountering hospital staff, the paragraph that you referenced, the vitals were taken, so some sort of screening was done by ambulance staff, and then the inferences, it was communicated to the hospital, and then he was assigned an acuity rating of three. But yet we're aware that the parties have finished discovery. I can't recall the last time I saw a case like this where it was fully briefed, discovery is done, so you were talking about what happened with the other comparator patients. You've got the benefit of all that, but yet we're now on a motion to dismiss instead of summary judgment. Importantly here, the plaintiff had the benefit of all that discovery when they drafted the Fourth Amendment complaint. The discovery and the multiple motion to dismiss process were occurring simultaneously or in parallel at the trial court level. Given the allegation, I don't know if I'm doing a good job of piecing the complaint together, but there is an allegation that no screening was done at all, and now what they're asking for is send us back, we're ready to go to summary judgment, and the court can make that determination based on how the discovery turns out. What's wrong with that? Because the allegation that no screening was done is strictly conclusory, and it's at odds with other factual judicial admissions in the text of the pleading itself. So to say no screening at all was done, this assumes what is supposed to be alleged in concrete material facts in the complaint itself. So it won't do any good to send us back for a motion for summary judgment analysis because they already had the benefit of all that discovery when they drafted this complaint, and even as alleged, it's not good enough and doesn't pass muster. Thank you, Your Honor. It appears my time is up. Thank you. We have some time for rebuttal. Thank you. Just addressing a few points that were made, I'm looking at the Intala statute, 1395 TD, which was attached as an addendum to our opening brief. Subsection E2 defines what the term participating hospital means under that code. So with respect to whether or not there's any precedent for whether a hospital can, I guess, essentially piggyback off of the data that is taken by EMT personnel or other third parties, the definition of participating hospital under the Intala statute says, by quote, it means a hospital that has entered into a provider agreement under 1395 CC, the Medicare treatment provision. So the statute itself says that the hospital screening examination that's referenced in the statute must be done by a Medicare-approved emergency hospital, not by any other third provider. So hopefully that clarifies whether or not the hospital was allowed to utilize EMT data. With respect to what is actually alleged in the complaint, and that is, of course, what's before the court, the complaint alleges in multiple places that there was no medical screening given whatsoever. This attempt to kind of parse out, well, he talked to an admitting clerk or some such thing. There's no allegations that he was given any medical treatment. An admitting clerk is a high school-level person who takes your information and makes sure you're in the system. She is in no way qualified to give a medical screening exam underneath the code provision, and there's no allegations that she provided or even attempted to provide any medical care. With respect to the acuity rating paragraph, again, there's no allegation that he received any examination, treatment, or screening when he was given that acuity score. In fact, there's no allegations that he was even in the hospital when the acuity score was given. So there's no allegations in the complaint that would support the hospital giving him any medical treatment whatsoever. With respect to the allegation or the argument that those allegations are conclusory, there's many factual proportions of the complaint which support that, such as the fact that he was removed less than one minute after his transfer to the hospital. It's very hard to do a medical screening exam in less than a minute. He was also ñ I also listed out in the complaint all of the tests that he was not given, including very basic ones like listening to his heart or checking his breathing rate, all the way including more extensive tests that you would still feel like you would see in this type of situation. So there's absolutely no complaints or factual allegations alleged in this complaint that would support the allegation that he was given a screening exam. And that is what is before the court on this motion. I guess I will forfeit the rest of my time unless the court has any questions. Apparently not. Thank you. We thank both sides for the argument. The case of Sandra Shaw v. HMC Health Care is submitted.
judges: IKUTA, NGUYEN, Anello